**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KYLA GARDNER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. _____** |
| | § | |
| **OCWEN LOAN SERVICING, LLC,** | § | |
| **OCWEN FINANCIAL CORPORATION,** | § | **JURY TRIAL DEMANDED** |
| **and HOMEWARD RESIDENTIAL, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

**KYLA GARDNER'S ORIGINAL COMPLAINT**

Kyla Gardner, Plaintiff, files this Original Complaint against Ocwen Loan Servicing, LLC, Ocwen Financial Corporation, and Homeward Residential, Inc., Defendants.

NATURE OF THE CASE

This is an employment action under Title VII of the Civil Rights Act of 1964, Title I of the Civil Rights Act of 1991, Section 1981 of the Civil Rights Act of 1866, and Chapter 21 of the Texas Labor Code to correct unlawful employment practices on the basis of race and retaliation and to provide appropriate relief to Kyla Gardner, who was adversely affected by such unlawful practices. Gardner also alleges that Defendants interfered with her job entitlements in violation of the Family and Medical Leave Act of 1993.

PARTIES

1. Kyla Gardner ("Gardner") is an individual who is a citizen of the State of Texas and a resident of Dallas County, Texas.

2. Ocwen Loan Servicing, LLC ("Ocwen") is a Delaware corporation with its principal office in West Palm Beach, Florida. Ocwen does business in the State of Texas which

<u>KYLA GARDNER'S ORIGINAL COMPLAINT</u> – Page 1

is the subject of this lawsuit.  Ocwen has local offices in Texas located at 166675 Addison Road, Addison, Texas 75001.  Ocwen may be served with summons through its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

3.      Ocwen Financial Corporation ("Ocwen") is a Delaware corporation with its principal office in West Palm Beach, Florida.  Ocwen does business in the State of Texas which is the subject of this lawsuit.  Ocwen has local offices in Texas located at 166675 Addison Road, Addison, Texas 75001.  Ocwen may be served with summons through its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

4.      Homeward Residential, Inc. ("Homeward") is a Delaware corporation with its principal office in Coppell, Texas.  Homeward does business in the State of Texas which is the subject of this lawsuit.  Homeward may be served with summons through its registered agent for service of process, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

5.      At all relevant times, Ocwen and Homeward have continuously been companies doing business in the State of Texas and the City of Addison, and have continuously had at least fifteen (15) employees.

6.      At all relevant times, Ocwen and Homeward have continuously been employers engaged in an industry affecting commerce within the meaning of sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e-(b), (g), and (h), Tex. Labor Code § 21.002(8), and the Family and Medical Leave Act, 29 U.S.C. §2611(4)(A).

<u>KYLA GARDNER'S ORIGINAL COMPLAINT</u> – Page 2

## JURISDICTION AND VENUE

7.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 based on Gardner's federal claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f)(1) and (3) ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981"), and the Family and Medical Leave Act of 1993, 29 U.S.C. §2601, *et seq.* (the "FMLA").

8.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Gardner's state law claims arising under the Texas Labor Code, Tex. Labor Code § 21.001, et seq. ("Texas Labor Code") because the state law claims are so related to the federal law claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

9.     Venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, because the alleged unlawful employment practices were committed within the jurisdiction, the employment records relevant to such practices are maintained and administered within the jurisdiction, and/or this is the judicial district in which Gardner worked or would have worked but for the alleged unlawful employment practices.  Venue is also proper in this jurisdiction because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.

## FACTS

10.     Gardner is an African-American female who began working for American Home Mortgage as a Customer Care Agent in its Customer Care Center located in Addison, Texas on April 14, 2008.

11.     From the beginning Gardner was a stellar employee.  Within 6 months, Gardner

was promoted to a Customer Care Escalations Supervisor "Executive Liaison" position. Between December 2008 and September 2009, Gardner received the Monthly MVP Team Member recognition consecutively each month.  In September 2009, Gardner was promoted to Office of Customer Advocacy/Office of the President.  In January 2012, Gardner was promoted to an Executive Liaison Senior position.  Between April 2008 and February 2012, Gardner's quality rating on customer calls was always 97-100%.

12.     In February 2012, Cindy McGovern became the manager of the Customer Care Center.  McGovern's discriminatory animus towards African-American females was apparent from the beginning.  Between March 2012 and June 2012, McGovern terminated approximately 6 employees; 5 of the 6 employees were minorities and 3 of the 5 employees were black females.

13.     Under McGovern's leadership, Gardner's success as an employee in the Customer Care Center and her leadership progression stalled.  McGovern failed to apply the same rules to Garner as she did to other non-black female employees.  The time required to be logged into the system answering customer calls is typically reduced for supervisors and team leads in order to allow time for the individuals to handle the supervisory responsibilities related to the positions. McGovern, however, increased the telephone time required for supervisors and team leads from 1 hour to 3 hours.  In addition, McGovern refused to permit Gardner and Wednesday Stoghill (black female) any exceptions for the time they were logged out of the system handling supervisory responsibilities.  McGovern, however, did allow Albert McGee (black male) daily exceptions for the time he was logged out of the system handling supervisory responsibilities. This disparate treatment essentially meant McGee was not required to spend 3 hours of telephone time like Gardner and Stoghill.  Another example of McGovern's disparate assignment of exceptions involved Jennifer Vidot (multi-raced female).  Almost daily, Annel Sanchez, under

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 4

McGovern's direction, gave Vidot an attendance exception when Vidot returned from her lunch break late.

14.     McGovern refused to permit Gardner any attendance exceptions.   Prior to McGovern taking over as manager, Gardner's immediate supervisor Ryan Fellows permitted Gardner attendance exceptions on the few days she needed to arrive late due to taking her grandmother to dialysis.   McGovern, however, refused to permit the few exceptions and instead reprimanded Gardner for arriving at noon for her 12-9 p.m. shift because McGovern wanted her supervisors to arrive 10-15 minutes early for each shift.

15.     In March 2012, American Home Mortgage's name changed to Homeward Residential, Inc.   As a result, all employees were required to get new employee badges to enter the building.   On August 10, 2012, prior to her shift, Gardner took 10 minutes to obtain her new badge.   Because she was in the building handling necessary company business, Fellows agreed to give Gardner an exception for the time spent getting her new badge so she would not be counted as tardy.   McGovern superseded Fellow's decision and gave Gardner a tardy and verbal warning for corrective action.

16.     On August 15, 2012, Gardner's upstairs neighbor had a fire.   The fire resulted in a flood and smoke damage in Gardner's apartment.   On this same day, Gardner was required to rush her grandmother to the emergency room.   Due to the emergency situation, Gardner called in on August 15, 2012 and August 16, 2012.   Fellows determined this was an emergency situation entitled to an exception.   McGovern, however, refused to permit Gardner an exception for this emergency situation and instead on August 16, 2012 gave Gardner a tardy and verbal warning corrective action.

17.     On November 2, 2012, Gardner complained to McGovern, Fellows, Senior Vice-

President Dave Wysor, and Human Resources Representative Tim Wright that she believed McGovern was treating her differently, harassing her, creating a hostile work environment, interfering with her ability to properly perform her job duties, and preventing her from being promoted. Gardner's complaints were ignored.

18.     Although McGovern found fault with everything Gardner did, others in the Company recognized the quality of Gardner's work.  On November 14, 2012, another employee Kimberly Rogers nominated Gardner to receive recognition as the Leader of the Quarter after working closely with her to resolve several executive escalations throughout the year.  When the names of the nominees were posted on the Company's website, McGovern questioned Gardner's nomination by writing "TBD" next to Gardner's name.   None of the other nominees had anything embarrassing written next to his or her name.

19.     In December 2013, Ocwen purchased Homeward.  Homeward employees were informed that the Company would follow Homeward's policies until January 1, 2014.

20.     On December 7, 2012, Fellows was terminated.  Per Company policy, Gardner was automatically assigned the role of acting supervisor on her 12-9 p.m. shift.  Under Gardner's leadership, the team stats, attendance, and quality scores improved.  On January 22, 2013, Gardner informed McGovern that she wanted to apply to be the permanent Supervisor on the 12-9 p.m. shift.

21.     On March 1, 2013, McGovern and Sanchez informed Gardner that she would not be the Supervisor on the 12-9 p.m. shift.  Gardner was given two options – (1) she could remain in her position as a Senior and move to the 7-4 p.m. shift or (2) she could go back to being an Agent on the 9-6 p.m. shift.  Gardner agreed to move to the 7-4 p.m. shift so she could remain in her leadership position.  McGovern led Gardner to believe that once Ocwen took over, the

Homeward leaders would have leadership positions in the new company.  Gardner interpreted going back to being an Agent as a demotion so that option was not acceptable.

22.     Shortly after Gardner changed shifts, McGovern moved McGee from his shift and promoted him to acting Supervisor on the 12-9 p.m.  McGee was not more qualified for the position than Gardner.  At the time Gardner was denied the Supervisor position on her 12-9 p.m. shift, there was a Supervisor position open on another shift.  Ultimately, McGovern filed the two Supervisor positions with men from outside of the Customer Care Center – Carey Dukes (white male) and Geraldo Riveria (Hispanic male).  Gardner was more qualified for the Supervisor positions than both Dukes and Riveria because of her numerous years of leadership experience in the Customer Care Center.  Upon information and belief, both Dukes and Riveria had less than 1 year of leadership experience in their respective business units.   At the time, McGovern's Supervisors were Christopher M. (last name unknown)(Hispanic male), Jorge Gomez (Hispanic male), Cary Dukes (white male), Valentin Hernandez (Hispanic male) David Glover (black male), Geraldo Riveria (Hispanic male), and Annel Sanchez (Hispanic female).

23.     McGovern's discriminatory treatment towards Gardner was not limited to refusing to permit exceptions and promotions.  Other evidence of McGovern's animus towards Gardner:

- Unjustified Low Quality Scores

1) July 7, 2012 – Gardner received a zero quality score for allegedly being condescending to a customer.  After listening to the call, Fellows disagreed that Gardner was condescending and decided not to reprimand Gardner for the call.  McGovern disagreed with Fellows and ordered him to move forward with giving Gardner a verbal warning for the quality of

the call.

2) October 2, 2012, Gardner received a zero quality score for a call that should have received a 100% quality score. After Gardner disagreed with the score and explained to McGovern that the Standard Operating Procedure ("SOP") provision was unclear. McGovern agreed with Gardner regarding the SOP and said that it would be changed. McGovern, however, refused to overturn Gardner's zero.

3) January 16, 2013 – Gardner received a zero quality score because a Quality Agent misinterpreted the Fair Debt Collection Practices Act laws and the Company's SOP regarding issuing Mini-Miranda disclosures. Although the Company's Legal Compliance Department confirmed that Gardner did nothing wrong, McGovern still reprimanded Gardner regarding the call.

-Unjustified Reprimands

1) On October 10, 2012, McGovern instituted a new policy which required certain people to be responsible for taking escalation calls during certain hours. Seniors and Supervisors were informed that if there was an escalation call, the Agent with the call was to be directed to his or her Senior to address the call. On November 1, 2012, an agent approached Gardner with an escalation call. Per the new policy, Gardner directed the agent to the Senior responsible for handling the call. Although Gardner followed policy, McGovern placed her on a final written corrective action for refusing to take the escalation call.

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 8

-Disparate Scheduling / Time Off

1) Gardner was approved for PTO on February 14th, 15th, 25th, and 26th. On February 12, 2013, Sanchez advised Gardner that McGovern had changed the start date of her Ocwen training from March 18, 2013 to February 25, 2013 and therefore, Gardner's February 25th and 26th PTO dates were cancelled. McGovern told Gardner that employees could not miss any of the training. As a result of McGovern's contention, Gardner rescheduled her vacation plans in order to attend the training. Contrary to McGovern's contention, other employees, including, George Mason (black male), Jorge Gomez (Hispanic male), Patrick Shaw (Indian male), Johnny C. (last name unknown)(Hispanic male), Omar (last name unknown)(Indian male) were permitted to take days off during training.

24. As a result of the hostile environment caused by McGovern, in March 2013, Gardner suffered from stress, depression and anxiety. On March 14, 2013, Gardner requested intermittent leave under the Family and Medical Leave Act for the above mentioned serious medical condition. On the same day, Gardner confirmed with Sanchez that management had received her FMLA paperwork and that Sanchez was aware of Gardner's request for FMLA leave. Per Prudential Financial, Gardner's FMLA was approved as of March 15, 2013.

25. On March 14, 2013, March 15, 2013, and March 19, 2013, Gardner took intermittent FMLA leave.

26. On March 19, 2013, Gardner complained to Human Resource Representative Alena McCutcheon regarding the race and sex discrimination she was experiencing from McGovern. In addition, Gardner informed McCutcheon that she felt Wright was sharing her

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 9

complaints against McGovern with McGovern.   McCutcheon advised Gardner to put her complaint in writing and email it to Donavon Corliss, Wright, and her, which Gardner did that same day.   McCutcheon assured Gardner her complaint would be kept confidential.   Gardner's complaint was not kept confidential.   McGovern was told about the complaint.

27.     On March 20, 2013, Sanchez informed Gardner that she was being placed on a final corrective action for 9 attendance occurrences.   Gardner objected to the final because she did not have 9 occurrences.   Sanchez counted March 14, 2013 and March 15, 2013, Gardner's requested FMLA leave dates, as unapproved absences.   In addition, per Homeward/Ocwen's attendance policy, absences and non-adherence occurrences automatically rolled off of an employee's attendance record after twelve months.   Accordingly, the occurrence Gardner received on March 18, 2012 was supposed to automatically roll off on March 18, 2013.   Therefore, Gardner really only had 6 occurrences.   Per Homeward/Ocwen's attendance policy, 6 occurrences warranted a verbal corrective action not a final.

28.     Gardner took FMLA leave from March 25, 2013 to May 6, 2013.   Gardner's FMLA leave documents were approved and updated by third-party administrator, Prudential Financial, on March 28, 2013.

29.     On April 1, 2013, Gardner contacted HR to inquire about the status of her March 20, 2013 final.   On April 2, 2013, Homeward/Ocwen rescinded Gardner's March 20, 2013 final.

30.     On April 25, 2013, Gardner, through her attorney of record, forwarded Homeland and Ocwen a copy of the Charge of Discrimination she intended to file with the Equal Employment Opportunity Commission ("EEOC") against the companies.

31.     On April 29, 2013, Gardner filed charges of discrimination with the EEOC against Homeland and Ocwen alleging violations of Title VII and the Texas Labor Code for race

and sex discrimination and retaliation for complaining about such discrimination.

32.     On May 1, 2013, Gardner notified Homeward/Ocwen, by email to Svetlana Farewell, of her intent to return to work on May 6, 2013.  On May 2, 2013, Farewell requested Gardner submit a return to work notice from her physician at least one business day prior to her return in order for Homeward/Ocwen to reinstate Gardner's network access timely.  Gardner submitted her return to work notice on or about May 2, 2013.

33.     On May 6, 2013, Gardner returned to work from leave.  Gardner's badge was inactive.  Because her badge was inactive, Gardner attempted to enter the building through the back door where her badge could be reactivated.  Gardner was not permitted to enter through the back door but was sent back to the front door.  Security had to let Gardner into the building. Because the security guard could not reactivate Gardner's badge, Gardner was taken to the HR Department to see Tim Wright.  Wright walked Gardner back to the security booth and told them to activate Gardner's badge.  After reactivating Gardner's badge, a security officer escorted Gardner to McGovern and informed her that Gardner was held up trying to enter the building because of the badge issue.

34.     When Gardner returned from FMLA leave, she was no longer an Executive Liaison Senior.  She had lost her Team Lead (Assist Supervisor) position and the escalated/ supervisory responsibilities associated with the position.  Prior to Gardner's leave of absence, McGovern explained to her that Ocwen did not have Supervisor or Team Lead positions. Instead, Ocwen's supervisors/team leads were called Escalated Relationship Managers ("ERM"). McGovern also said that supervisors under Homeward would be ERMs under Ocwen on what she referred to as a SWAT team.  Under Homeward, there were 3 Seniors – Gardner, Stoghill, and McGee.  Gardner was the only Team Lead not on SWAT.  Gardner was demoted to an entry

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 11

level position of Customer Service Agent.  She was moved from Sanchez's team to Christopher Moreno's team.  Former customer service agents, such as, Veronica Puentes, Sandra Darby, Simon Chavez, and Christopher (last name unknown), were promoted to ERMs and placed on SWAT.  According to Sandra Darby, Gardner's name was on the list as a member of the SWAT/ERM.  Therefore, at some point, Gardner was supposed to be on the team but the decision was made to demote her instead.

35.     During Gardner's leave and after she returned from leave, she asked McGovern, Sanchez, and Wright for a copy of her attendance record.  On May 15, 2013, Sanchez informed Gardner that she needed to obtain clarification from Wright and McGovern regarding Gardner's request for a copy of her attendance record and that the three of them would review Gardner's request and discuss her attendance record with her on May 22, 2013.  On or about May 22, 2013, Sanchez provided Gardner with a copy of her monthly attendance tracker.  Gardner was shocked to learn that McGovern had advised Sanchez to go back and mark Gardner tardy on 3/21/2013 and 3/22/2013.  Gardner disputed the tardies because she was in the building within the allotted 5 minute grace period her department had been practicing for more than 6 months.  The tardies were included in retaliation for Gardner's discrimination charge.  Prior to Gardner's charge, she nor any of the other employees were given a tardy under this scenario.  In addition, McGovern gave Gardner a tardy for 5/6/2013 – the date Gardner could not enter the building promptly due to Ocwen's employee's failure to reactivate her badge.  McGovern's actions were taken to move Gardner closer to a corrective action for attendance and ultimately termination.

36.     On May 30, 2013, following a meeting with McGovern and HR, Gardner could not return to work.  She felt as if she was having an emotional breakdown and she sat in her car crying.  At approximately, 3:30 p.m. Gardner informed Sanchez that she was having an anxiety

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 12

emotional breakdown and could not return to work.  Although Gardner was under continual doctor's care for stress, depression and anxiety and Sanchez was well aware of Gardner's approval for intermittent FMLA leave, Sanchez failed to advise Gardner that the leave could count as FMLA leave.  Instead, Sanchez marked Gardner tardy and then used this date against Gardner to terminate her employment.

37.     On June 11, 2013, Gardner took FMLA leave.  After Gardner submitted her paperwork to Prudential, Prudential attempted to get in contact with Homeward/Ocwen to confirm Gardner's leave.  Homeward/Ocwen refused to respond to Prudential.  On August 23, 2013, Human Resources Representative Martha Lynn claimed that the date would not count as FMLA because Gardner made no reference to the FMLA when she called in.  This is incorrect. Gardner informed Homeward/Ocwen that the day was FMLA leave.  As a result of Homeward/Ocwen's refusal to respond to Prudential, Prudential denied June 11, 2013 for FMLA leave.  McGovern gave Gardner a tardy for June 11, 2013 and then used the tardy against Gardner to terminate her employment.

38.     The EEOC sent Gardner a Notice of Right to Sue on Charge No. 450-2013-02600C against Ocwen on July 22, 2013.

39.     On August 6, 2013, Homeward/Ocwen employees were informed that Prudential was terminated effective August 1, 2013.  CIGNA would take over in November 2013.  On August 12, 2013, Gardner began requesting information regarding the proper policies and procedures for taking leave during August 1, 2013 and November 2013 when CIGNA was scheduled to take over.  No one responded with the information.  Instead, on August 30, 2013, Lynn told Gardner not to worry about the procedure and to just stop taking off.

40.     On August 23, 2013, Gardner arrived to work at 9:28 a.m.  She arrived at her desk

at 9:30 a.m.  Her PC rebooted at 9:31 a.m.  At 9:32 a.m., McGovern came to Gardner's desk and asked her to come with her to HR.  McGovern observed that Gardner was not able to log into the system.  Gardner stood at Gardner's desk from 9:32 a.m. to 9:35 a.m. watching her have problems logging into the system.  At 9:35 a.m., McGovern told Gardner to forget about logging in and to come with her to HR.  Given that McGovern saw that she was attempting to log into the system but could not, Gardner did not think she needed to document her log in issues and time associated with the issues.  Gardner was wrong.  Although Gardner arrived on time but could not log in due to system problems, McGovern gave Gardner a tardy for August 23, 2013 and then used the tardy to terminate Gardner's employment.

41.     On August 24, 2013, Gardner emailed McGovern, HR, CEO, and CFO to dispute dates that McGovern had rolled back as retaliation to keep her on a corrective action and ultimately terminate her employment.  No one responded to Gardner's email.

42.     On August 30, 2013, Gardner was called to HR for a meeting with Troy Griffin (African-American male manager), McGovern, and Lynn during which McGovern and Lynn attempted to force Gardner to sign a 1 paragraph document stating that she was aware of and understood how to call in for FMLA.  After Gardner advised McGovern and Lynn that she would not sign the document because it did not inform her of how to handle FMLA during the time there was no third-party administrator or how to obtain additional leave time.  When Gardner refused to sign the document, she was ordered to get back on the telephones.

43.     Following the August 30, 2013 meeting, Gardner went to Griffin's office and broke down crying.  Griffin said he did not want to be involved.  After leaving Griffin's office, Gardner had an anxiety attack at her desk.  Gardner advised supervisor Chinette T. (last name unknown) that she was leaving for the day.  In addition, Gardner emailed CEO, HR Managers,

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 14

Lynn, and Troy that she was leaving for the day.  After Gardner left, McGovern had a meeting with Chinette in which she forced her to tell her what Gardner said.  In addition, McGovern informed Chinette not to talk to Gardner and threatened her job if she did not tell her what Gardner said.

44.     On August 30, 2013, at approximately 4:30 p.m., after Gardner had left for the day, Lynn finally emailed Gardner in response to her numerous requests for information on getting additional leave time because she was under a lot of stress and had been having anxiety and panic attacks more often.  Gardner was struggling at work and at home.  Lynn informed Gardner that she would need a recertification from her doctor stating that she needed more time off.

45.     Gardner was out on FMLA leave on September 2, 2013 and September 3, 2013.

46.     Gardner returned to work on September 4, 2013.  Gardner received Lynn's email regarding the need for recertification.  Shortly thereafter, Gardner was terminated for excessive absences.

47.     As a result of Gardner's termination, she suffered significant financial loss and loss of the benefits of her employment, including health insurance.

48.     Gardner has exhausted her administrative remedies.

49.     All conditions precedent to the institution of this lawsuit have been fulfilled.

CAUSES OF ACTION

**A)     Race Discrimination in Violation of Title VII (42 U.S.C. §§ 2000e-2(a)(1)) and Texas Labor Code (Tex. Labor Code § 21.051)**

50.     Gardner incorporates the preceding paragraphs as if fully stated herein.

51.     Gardner is a member of a protected class (African-American race).

52.     Defendants engaged in unlawful employment practices in violation of Title VII by failing to promote Gardner to a Supervisor position, demoting Gardner to a Customer Service Agent position, and terminating Gardner's employment on the basis of her race.

53.     The effect of the practices complained of above has been to deprive Gardner of equal employment opportunities and to otherwise adversely affect her status as an employee on the basis of race and in retaliation for her complaints against such unlawful practices.

54.     Defendants' wrongful acts and the conduct of its agents and/or employees acting within the scope and course of their employment have been the proximate cause of Gardner's injuries.

55.     As a result of Defendants' unlawful conduct, Gardner is entitled to recover her actual damages, attorney's fees, expert witness fees, costs and prejudgment interest.

56.     The unlawful employment practices complained of above were done intentionally, with malice and/or with reckless indifference to Gardner's rights.  Gardner is accordingly entitled to punitive damages.

57.     As a result of Defendants' discriminatory conduct, Gardner was forced to retain legal counsel to file this lawsuit to redress the harms inflicted upon her.  Accordingly, Gardner seeks attorney's fees, expert witness fees, and costs under 42 U.S.C. § 2000e-5(k) and Tex. Labor Code § 21.259.

**B)     Race Discrimination in Violation of Section 1981**

58.     Gardner incorporates the preceding paragraphs as if fully stated herein.

59.     Gardner is a member of a protected class (African-American race).

60.     Defendants engaged in unlawful employment practices in violation of Section 1981 by failing to promote Gardner to a Supervisor position, demoting Gardner to a Customer

Service Agent position, and terminating Gardner's employment on the basis of her race.

61.    The effect of the practices complained of above has been to deprive Gardner of her federally protected rights on the basis of race.

62.    The unlawful employment practices complained of above were intentional.  The unlawful employment practices complained of above were and are done with malice or with reckless indifference to the federally protected rights of Gardner.  Gardner is accordingly entitled to punitive damages.

63.    As a result of Defendants' discriminatory conduct, Gardner was forced to retain legal counsel to file this lawsuit to redress the harms inflicted upon her.  Accordingly, Gardner seeks attorney's fees, expert witness fees, and costs under Section 1981.

**C)    Sex Discrimination in Violation of Title VII (42 U.S.C. §§ 2000e-2(a)(1)) and Texas Labor Code (Tex. Labor Code § 21.051)**

64.    Gardner incorporates the preceding paragraphs as if fully stated herein.

65.    Gardner is a member of a protected class (female gender).

66.    Defendants engaged in unlawful employment practices in violation of Title VII by failing to promote Gardner to a Supervisor position, demoting Gardner to a Customer Service Agent position, and terminating Gardner's employment on the basis of her gender.

67.    The effect of the practices complained of above has been to deprive Gardner of equal employment opportunities and to otherwise adversely affect her status as an employee on the basis of gender.

68.    Defendants' wrongful acts and the conduct of its agents and/or employees acting within the scope and course of their employment have been the proximate cause of Gardner's injuries.

69.     As a result of Defendants' unlawful conduct, Gardner is entitled to recover her actual damages, attorney's fees, expert witness fees, costs and prejudgment interest.

70.     The unlawful employment practices complained of above were done intentionally, with malice and/or with reckless indifference to Gardner's rights.  Gardner is accordingly entitled to punitive damages.

71.     As a result of Defendants' discriminatory conduct, Gardner was forced to retain legal counsel to file this lawsuit to redress the harms inflicted upon her.  Accordingly, Gardner seeks attorney's fees, expert witness fees, and costs under 42 U.S.C. § 2000e-5(k) and Tex. Labor Code § 21.259.

**D)     Retaliation in Violation of Title VII, Texas Labor Code, and Section 1981**

72.     Gardner incorporates the preceding paragraphs as if fully stated herein.

73.     Gardner engaged in protected activity when she reported her belief that Defendants were engaging in unlawful discrimination.

74.     Gardner suffered adverse employment actions including inaccurate tardies, refusal to approve FMLA leave dates, demotion, and termination.

75.      Defendants' wrongful acts and the conduct of its agents and/or employees acting within the scope and course of their employment have been the proximate cause of Gardner's injuries.

76.     As a result of Defendants' unlawful conduct, Gardner is entitled to recover her actual damages, attorney's fees, expert witness fees, costs and prejudgment interest.

77.     The unlawful employment practices complained of above were done intentionally, with malice and/or with reckless indifference to Gardner's rights.  Gardner is accordingly entitled to punitive damages.

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 18

78.     As a result of Defendants' discriminatory conduct, Gardner was forced to retain legal counsel to file this lawsuit to redress the harms inflicted upon her.  Accordingly, Gardner seeks attorney's fees, expert witness fees, and costs.

**E)     Family and Medical Leave Act Interference**

79.     Gardner incorporates the preceding paragraphs as if fully stated herein.

80.     Gardner was an eligible employee under the FMLA.  Gardner had worked for at least twelve (12) months, and had worked at least 1,250 hours during the twelve (12) months prior to taking the leave.

81.     Defendants are employers subject to the provisions of the FMLA.  Defendants employed at least fifty (50) employees within a seventy-five (75) mile radius of Gardner's work site for twenty (20) or more work weeks in the prior or current calendar year.

82.     Gardner was entitled to FMLA leave.  Gardner suffered from a "serious health condition" as defined by the FMLA.  29 U.S.C. §2611(11).  In particular, Gardner was under continuing treatment by a health care provider for stress, depression and anxiety.

83.     Defendants interfered with Gardner's exercise of the benefits she was entitled to under the FMLA, including, but not limited to, failing to advise Gardner or her rights under the FMLA, refusing to approve FMLA leave, and failing to restore Gardner to her position or an equivalent position when she returned from FMLA leave.

84.     As a result of the interference and termination by Defendants, Gardner has suffered significant financial loss, and the loss of benefits of her employment, including health insurance.

85.     Defendants' acts are willful violations of the Family and Medical Leave Act of 1993, and entitle Gardner to recover damages as provided at 29 U.S.C. § 2617, including

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 19

liquidated damages.

86.     As a result of Defendants' actions, Gardner has found it necessary to hire the services of the undersigned attorney, for which Plaintiff seeks relief.

JURY TRIAL REQUEST

87.     Gardner requests a trial by jury.

PRAYER FOR RELIEF

For the reasons stated above, Kyla Gardner respectfully requests that at the conclusion of this proceeding the Court:

A.     Order Defendants to make whole Kyla Gardner by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, front pay and reinstatement.

B.     Order Defendants to make whole Kyla Gardner by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

C.     Order Defendants to make Kyla Gardner whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including pain, suffering and humiliation, in amounts to be determined at trial.

D.     Order Defendants to pay Kyla Gardner all wages, salary, employment benefits, and other compensation lost as a result of Defendants' wrongful conduct in an amount to be determined at trial as a result of Defendants' violation of the Family and Medical Leave Act.

E.     Order Defendants to pay Kyla Gardner liquidated damages in an amount equal to all lost wages, salary, employment benefits, and other compensation list as a result of

KYLA GARDNER'S ORIGINAL COMPLAINT – Page 20

Defendants' violations of the Family and Medical Leave Act in the amount proven at trial.

       F.    Order Defendants to pay Kyla Gardner for Defendants' malicious and reckless conduct in amounts to be determined at final hearing.

       G.    Award Kyla Gardner attorney's fees, expert witness fees, and costs of this action.

       H.    Grant Kyla Gardner such further and other relief as the Court deems necessary and proper in the public interest.

       Respectfully submitted,


       */s/ Karen D. McCloud*
       _____
       Karen D. McCloud
       State Bar No. 24013125
       **KAREN D. MCCLOUD, P.C.**
       3102 Maple Avenue, Suite 400
       Dallas, TX 75201
       Telephone: 214-651-6700
       Facsimile: 214-651-6701
       Email:  kmccloud@karenmccloud.com

       **ATTORNEY FOR KYLA GARDNER PETITIONER**